My name is John Bedry. I'm here for Stevedoring Services of America and Homeport Insurance. I'd like to reserve five minutes for rebuttal, and it's my hope that most of the Court's questions, if it has any, of me concerning the combined awards issue would be addressed at that point. That's Mr. Price's issue where he's going to go first. This is a dispute not over the extent of the claimant's disability, but over whether the former insurance carrier on the risk when he was hurt in 1991 or the current insurance carrier, Homeport, is responsible for the permanent total disability compensation, and then what the Mr. Price's compensation rate is, assuming Homeport is responsible. I think the threshold issue on appeal is whether the administrative law judge even created a reviewable record here. And the Court's read the briefs. I don't want to try to go through every twist and turn, but the key question is whether the Administrative Procedure Act requirement that the ALJ make findings and conclusions and the reasons or basis therefore has been complied with. The — our brief shows — and the record shows extensive colloquy over the question of what do sling men and gang bosses do, very little, if any, of which was even described by the judge in his recitation of the evidence, and really none of it evaluated to lead to the conclusion that, yes, there was an aggravation. I'd refer to the discussion at pages 25 through 28 of our opening blue brief for that. The other issue turns on the medical testimony to Dr. Barclay, which is how he pronounces it. Kennedy. Barclay, even though it's spelled Berkley? Verrilli, Jr. It looks like Berkley pronounced Barclay. Kennedy. That's the British pronunciation. Verrilli, Jr. Yes, that is the British pronunciation. Kennedy. Versus Dr. Veasley. Verrilli, Jr. Yes. Vesley. And I think that's Italian, but I'm not sure. Anyway, the — I think in looking at this record, I think the Court could — I think the issue boils down to one page of the administrative law judge's decision. I would invite the Court to take a look at page 284 of the excerpts. And I won't try to read the page, but — Kennedy. I find Dr. Barclay's medical findings to be reasonable and appropriate based on his reasoned opinions and analyses set forth in his testimony and medical reports. Verrilli, Jr. Right. Kennedy. Furthermore, he's an attending physician, not just somebody who saw him once. Verrilli, Jr. Right. And then he concludes triumphantly, Mr. Price is permanently and totally disabled, which was never disputed. So we're not sure what the judge was thinking. The problem is, if you go all the way back up to the top of that page and look at all of that discussion about — Breyer. I'm sorry. I just — Verrilli, Jr. Pardon me? Breyer. I'm still reading the paragraph. Now, what is it that — Verrilli, Jr. Well, what he is doing here — Breyer. He's saying, I look at Barclay's — Verrilli, Jr. Yeah. Breyer. — evidence and — Verrilli, Jr. And I credit him. He's believable. He's the attending physician. And therefore, Price is permanently and totally disabled. Never in dispute. Not a dispute. What he's also doing, as he discusses in the paragraphs above the paragraph that Judge the man's condition progressed after two surgeries and with degenerative arthritis in his low back. The problem is, none of that establishes an aggravation. It is as consistent with a natural progression where responsibility doesn't shift as it is with an aggravation where responsibility does shift. And so it's hard to say what the administrative law judge had in mind. We've briefed Amos has any role in a question like this that didn't concern diagnosis or treatment. And the other point that I would urge the Court to look at that I think concentrates the focus on this issue is the first five pages of the excerpts of record. Breyer. Well, let me ask one simple question. Did Dr. Barclay's testimony suggest that what Mr. Price was doing from 1992 to what was it, 1998? Correct. That what he was doing in that period would aggravate or combine in some way with the prior injury? Was that Dr. Barclay's conclusion? That was his conclusion. So why isn't that the end of the case as to whether Homeport is responsible as a carrier for the last employer? Well, it's not the end of the case because of the information that Dr. Barclay purported to base it on. Longshore work is very physical work. It involves lots of spinal loading, twisting, jumping, jogging, or I think he meant jolting of the spine. I mean, that's what he based it on. That's what he based it on. What's incorrect about that, if Mr. Price is helping to sling, you know, large logs and help guide them while a crane moves them? Why wouldn't that be what he said? Well, Price doesn't describe the work in those terms, vertical spinal loading, jumping, twisting, or jogging the spine. The superintendent of the Stevedore Company, Noel, doesn't describe it that way. The videotape doesn't show it that way. Is that right? Pardon me? Is that right? It looked like there was a bit of twisting. Well, what he's doing is they get up from the dog shack or the lawn chairs that day and they take the sling, which has been lowered down by the crane operator, and they give them some slack, literally. They take it around the end of the logs. They hook it into a bell-type formation. You say they take it around. Yeah. There's something very heavy in it, right? Well, it's suspended by the ship's gear. It's being held by a crane, but the thing that's in it is heavy, right? Right. Why do they take it around? Isn't that taking it around something that would involve at least some minor twisting or pulling or bending? Obviously, we couldn't put a video. Maybe 20 years from now, we can put a moving videotape in the back of a brief as an appendix, but we couldn't do that. Was it in evidence? It's in the record, right? It is in the record. The videotape itself is Exhibit 60, Stevedoring Services of America. Some of the stills from it are in the back of our blue brief. And you say the videotape necessarily requires what conclusion? Well, I think if you're looking at it, you're not seeing anybody jumping, twisting, doing any vertical loading. They are doing sedentary, polite work. It's true, but Barclay says he talked to the claimant, and the claimant described his duties to him that over the course of the claimant's medical examination, he discussed the details of his work as slingman and gang boss. Right. So you have another source of information here, what the claimant told him about what he actually did, not some videotape. Well, it doesn't add up. The problem is, in fact, in rebuttal, Price says, yeah, I told him it was just like what was on that videotape there, and that Dr. Barclay's got the conclusion that it's much heavier work than what he describes. The problem is the judge never resolved those contradictions in the record, as the APA requires. I'm just about to the time I'd like to save for rebuttal. All right. The problem, in five seconds, with the average weekly wage issue, I think, is we have an actual finding of fact that the wage earning capacity of Mr. Price didn't exceed his actual earnings, which is $1,156.15 a week. And under those circumstances, whatever else I might have to say about the Matulik case and using 10A, that finding of fact means you can't fairly and reasonably use 10A and give him an average weekly wage of $1,525.90. That is almost $400 greater than his actual earnings and more than he ever earned in his work career. There was a typo. The disparity is $369.75. I think I added $100 in there at one point. And we'd rely on our briefs for the balance of that argument, and I'd be happy to answer any questions about that now or in my rebuttal time. All right. Thank you, Counsel. Thank you. Can I please, the Court, counsel? Charles Revento. It's for Errol Price in this case. I'm just going to take a few minutes to — but let me ask the Court first if I could reserve about three minutes for rebuttal of the — on the cross-petition issues. Sure. Thank you. I think the Court understood the arguments of Homeport on the issue of causation. I just want to make two comments. The argument they're really making to this Court is the argument they made to the administrative law judge that you should believe Dr. Vesely, you should believe the videotapes, don't believe Dr. Barkley, don't believe Mr. Price. And that was something that was within the province of the administrative law judge to make. I thought it was a little more subtle than that. They were saying that ALJ presented with those conflicting or contradictory or differing views, didn't explicitly explain why he picked one over the other. Well, that's the argument they're making. But on page 284 of the excerpts of record, the judge discusses, the administrative law judge discusses the issue of permanent total disability, but what he's really discussing is causation there, because both parties agreed that Mr. Price was permanently and totally disabled, but they disputed that either the 91 injury or the effects of the work up to 1998 was a cause of that. So the judge really was discussing it under that. And he did make a technical mistake by saying that the evidence wasn't rebutted. Dr. Vesely's opinion does rebut it. And then what the judge would have to do is weigh Dr. Vesely's opinion against Dr. Barkley's opinion, which is what he did, and he concluded that Dr. Barkley was more credible. If he concluded he's crediting Dr. Barkley, then it seems to render harmless not saying that the presumption was rebutted. That's what I stated, right. Therefore, based on Dr. Barkley's medical opinion, after talking about the difference, finding his findings to be reasonable, Vesely only saw him on one occasion. Okay, go ahead. Anyway, the argument on Mottulik is the argument that they made is that 10A should not apply to Mr. Price because he was he did not work substantially the whole of the year. And they're arguing Mottulik results in overcompensation, all these issues which this Court decided in Mottulik and recognized the overcompensation. And Mr. Price barely, his work number of days barely got over the threshold that this Court had set, more than 75 percent. So there's going to be more overcompensation in this case than there would be in most other cases. But the argument is it certainly does apply to Mr. Price. He worked as a regular longshoreman out of the Port of Longview. It's stable. It's continuous work. And there was absolutely no reason not to apply it, 10A, based on Mottulik to Mr. Price. I raised a couple of issues on the cross-petition. Kennedy. Could you address the question under, what is it, the Brady-Hamilton? Yes, that's what I was going to get to. That's when this Court decided the Brady-Hamilton case, which actually was a case that I represented Mr. Anderson on, who was the injured worker, the Court felt that, First of all, it decided it under Section 8A of the Longshore Act, not Section 6B, which applies to a maximum, which puts a maximum compensation rate for any one injury as a 200 percent of the national average weekly wage. 8A says that when you have total disability, you can't get more than two-thirds of your average weekly wage. And what this Court held in the Anderson case, as I understand it, is Mr. Anderson had a prior permanent partial disability award, and his wages had actually increased several years later, and he was making more money, and then he was permanently and totally disabled in 1982. He had received an award, I think, in 1997. And the administrative law judge left the 77 award in place and then awarded him two-thirds of his average weekly wage in 1982. And this Court said when you do that, you've got to look at why his earnings have increased. And if they increased because his disability has lessened from 1997, you've got to go back and make some adjustments in the permanent partial disability award. And so it doesn't exceed two-thirds of his average weekly wage. But the question in this case is under Section 6B, that maximum rate, is can — does that apply to only one injury, or can — may that apply to — may that apply to combined disability awards? Out of the same injury. Excuse me? Out of the same injury or different injury? Out of different injuries. Say another. Different injuries. Right. Because Mr. Price had a 1979 injury and got an award in that case, but that's a little under $200 a week. And what does that reflect? Does that reflect his diminished earning capacity post-1979? That's correct. Okay. So it's already been — so his earning capacity has been presumably diminished and compensated for by that award. Right. Now we're looking at the 1998 situation. Right. And the question is whether or not that award should have any impact — that prior award should have any impact on the maximum cap — Right. — under — you're calling it Anderson-DeGrady — Right. — opinion, and whether you should, in effect, subtract. I guess that looks like it was subtracted out. He calculated his award for 98 and then offset the prior. Well, the 98 award exceeded the maximum cap anyway, so that was — the 98 award was actually less than two-thirds anyway because two-thirds of 1,500 was 1,000, and I think the maximum was 871 or something like that. So — or 835, I forget what it applied in this case. So he's not — the maximum cap did apply to the 98 award. The question is what happens to the 79 award? Is the 79 award on top of that, or is that absorbed into the whole thing? I didn't totally understand this point. It seemed like the earlier 79 award — Right. — made a calculation of a partial permanent disability with some estimate of what his future earnings would be compared to his prior earnings, but it looked like his actual earnings throughout this whole period were way beyond the figure that had been estimated in making that calculation. Am I correct in that reading on the facts? And does that have any significance for this case? I don't think — I wouldn't word it that way. What happened is in 79, he was working as a longshoreman nine months of the year, and three months he went up to Alaska to fish. And what the judge did, or what — actually, this Court revised that around, is that it held that the fishing earnings have to be combined with the longshore earnings, and the longshore earnings were based on what Mr. Price was earning and the wage rate in 1978, actually, because it's the 52 weeks before he got hurt, mostly 78 earnings. And it was based on his work habits at the time as well. He was — at that time, he was married. His wife's family had given them a house to live in for free. He loved horseback riding. Whenever it was nice, he'd go horseback riding instead of working. So he wasn't, you know, the great worker. After the back injury sometime in the mid-'80s, he got divorced. He didn't have the free house. He couldn't horseback ride anymore. He couldn't pick and choose his jobs and work whenever he wanted. So he essentially camped out at the union hall and took everything he possibly could and was actually working more hours, even though it was in pain and with lighter jobs. Well, his residual wage that they set on a daily basis back in 79 was $333.87. That was the residual wage in 1979 dollars. Great wage rates, right. Right. And then when they make this calculation for the permanent disability — When the judge made the calculation of what he actually made in that period of time in the later period, what are they saying he's making per day? I think it was about $300 a day is what he averaged. I mean, that included, you know, higher wage rates. The judge also found — well, the 1979 award was based on Section 10C and not Section 10A because he wasn't working as a longshoreman as regularly. There were some other factors, too, that his work habits had changed, and that did not affect his loss. It did not change his loss from 79, but his work habits were better. Okay. So that's what the judge did. And he found that there was no decrease or no lessening of his loss of wage earning capacity from 79. And so that's how he did that. One of the issues on the cross-appeal is the 1999 wage rate. And what he did there is he said the law of the case applies, and the law of the case is the 79 injury. And therefore, he gave him $333 for his wage rate in 1997 — in 1991, which is incorrect because the same factors that affected the 98 one also were present in 91. And he never took into account any of the wage rate increases. And law of the case does not really apply in this kind of situation. What the judge was doing was applying the law of the life of the longshoreman and stuck Mr. Price with this low average weekly wage for the rest of his life. And he should have done what? He should have done the same thing in 91 that he did in 98 and said that there's been a — that this is what it is in 91, and he hasn't — he's not — the law of the case doesn't apply to the 91 injury. The other issues are on the Eagle Pacific claim. There's a wage — well, the wage rate is one factor. The other issue is the — it was an issue of temporary total disability. The record shows that Mr. Price was only paid up until January 2. Mr. Metz wanted to remind me that there were some things beyond the record on that, but the wage rate is still an issue, and that temporary total is still an issue no matter what else may come in subsequently on remand. And then there's the permanent partial issue. We should have gotten something for the permanent partial issue. The fact that we had to wait 7 years to get — or 6 years to get a hearing on that should not throw out even the dollar a week that he should have been entitled to for a significant possibility of loss of wage or any capacity. He did have two serious surgeries following the 1991 injury. Thank you. Thank you. Thanks. Good morning, Your Honors. Russell Metz for Eagle Insurance, the first of the two carriers involved in this case. We concur with Mr. Rabinowitz's remarks with respect to the responsible employer here for perhaps obvious reasons. Yes. Yep. All right. I won't rehash the record with respect to Dr. Barclay's testimony and the claimants. With regard to the other issues here that were alluded to by — actually explicitly mentioned by Mr. Rabinowitz, the TTD or the time loss issue, that the ALJ found that the parties had stipulated to the payment of time loss benefits to the claimant from the date of his injury, October 2, 1991, through November of the following year when he went back to work. That is now an issue. It wasn't something that the Benefits Review Board had to deal with, however. The record shows that my client, Eagle Pacific, paid time loss benefits to Mr. Price up through January 2, 1998. But that's not the complete record, and Mr. Rabinowitz and the claimant know that because the rest of the benefits that he was entitled to, in our view, were paid as far back as 1997. And what does this mean? It means that's really not an issue. And if it's not an issue, then a determination as to his average weekly wage for the 1991 injury is not — one need not decide that, which is what the Benefits Review Board decided because they said — well, first of all, they believed that time loss wasn't an issue. It wasn't discussed. The thing that they did discuss was the ALJ's findings and conclusions with respect to whether there was any permanent disability as a result of the 1991 injury before Mr. Price eventually and finally left work on July 2, 1998. The ALJ found that there was no permanent disability, and the Benefits Review Board affirmed that. Therefore, you don't have to deal with the average weekly wage. I didn't brief the average weekly wage here. That was perhaps a mistake, but I didn't brief it. Therefore, I'm not going to argue it. But I don't think that needs to be argued or discussed, really, because there is nothing that touches upon that. if you find that the claimant had no permanent disability beginning in 1992 when he went back to work up until 1998. And the judge made that conclusion based upon the claimant's testimony that he didn't lose any money during that period of time. On the day of the hearing, and this is in the record, they bring up for the first time that Mr. Price was missing 22 days a year because he had to give up working these what they called catwalk jobs. That was the first time that that was broached. The judge rationally found that the other testimony from the claimant, plus his wage records, indicated that every year after he went back to work up through 1998, his earnings increased. And his deposition testimony was that he missed no time because he had to turn down the catwalk jobs. On the day of the hearing, he changes that. Partially. I think he also said, and it's in the transcript, that I did not take the catwalk jobs, but I found something else, meaning something else to do in the way of work. We objected to that evidence at the hearing. The judge took it under advisement, discussed the evidence anyway and his decision in order, and found against the claimant on that particular point. And the BRB affirmed him. And we would ask that this Court do likewise. Thank you. Thank you, counsel. There were, Your Honor, three points, I think, that came up in the Mr. Rabinowitz's argument that I'd like to address. The first, and it was, I believe, Judge Gould's question, well, if Dr. Barkley was credited, what does it matter whether the presumption was rebutted or not?  Well, the first thing is, it's a matter of the pros and cons of the claimant's decision. If the claimant makes a prima facie case and the employer fails to rebut it, you basically don't look at the employer's evidence. It's decided on the claimant's evidence. If the employer does rebut it, then the case has to be decided on all the evidence with the claimant having the burden of persuasion. Were these points made to the ALJ? Yes, Your Honor. So can't you assume that he was following that, those guidelines? Well, you read his decision, and you can't tell. It's all higher. I've read it a couple of times. Pulled together. And it seems to me that he says Barkley wins, and Bessie saw him once. Barkley's credible. And can't you read between the lines that he's following the rules? Well, I would submit he never did answer the key question, what do these guys do, and did Dr. Barkley understand it correctly? Anyway, that's why I think the presumption is important. The second point that Mr. Rabinowitz brought up was, well, there's a finding, the employment was stable and continuous, therefore, you use 10A as applied by the Matulak case. I'd refer the Court to our red brief, our answering reply brief, pages 19 and 20. Mr. Price admitted the work fluctuated, and he worked from job to job. The undisputed facts show that the work was intermittent, as had always been understood in this circuit since the early 30s in the Mahoney case. The third point gets back again to the, this Matulak issue, and that was the discussion concerning the, whether his wagering capacity increased after 1979. And there are actual, there are findings that Mr. Rabinowitz asked the judge to make on the claimant's behalf, to the effect that it didn't. And nothing in Matulak indicates that you can take, in this case, 95, 195 days, is all you have to work, if you're a five-day worker, to get a 10A average weekly wage. He made that by two days, and it inflated his earnings by $19,000. And this is in the face of a finding that his actual wage earning capacity was the actual earnings. Not only that, there's the additional reason that his work was discontinuous. And we think that as the ALJ, and particularly the Board, discussed the old Mahoney case, which Matulak doesn't overrule. In effect, the Board has said this Court overruled precedent that both the majority and the dissent held was still valid. And we'd submit that on its facts, when you have an actual wage earning capacity, the prohibition or the counseling in Mahoney, that a theoretical wage earning capacity isn't to be used when it's a defiance to the facts, has to be respected. And that if this issue is not to be revisited on remand, or if responsibility isn't, even if it is, I think it's clear that the actual finding will control here, notwithstanding the inflation that's built in as a result of the Court's 75 percent rule. And we also briefed the supposed policy reasons for that. We think they're absent. I'm not going to go into that at this point. Do you agree on the Brady-Hamilton discussion, you don't have any disagreement with Mr. Price's argument? Oh, we do. And we briefed our disagreement on that. Okay. At pages 16 to 18 of our red brief, look at 8C20. Yeah. We disagree. And I think we're going to talk about that later. I'm sorry. That's fine. If you're just repeating your brief, you don't need to do that. It's in there. And I think there's a statutory basis for the decisions below. Thank you, counsel. Last to address Mr. Ovenewitz, then. Thank you. I just want to reply to some of the issues on the cross petition. The first one is the 6B1 issue, Section 6B1. One of the things I did not mention earlier is there is a D.C. Circuit opinion, Hastings v. Earth Satellite Corporation, that did discuss this issue. It's a 1980 opinion. It was one that I asked to submit additional authority on. Although I had mentioned Hastings in the reply brief, I did not realize it had discussed the 6B1 issue, although it was dictum in the opinion. And in that decision, the Court held as dictum that the language of the statute says it applies to one award only. There's also a footnote in that opinion, footnote 13. The Director participated in that, on that issue, and suggested that this would be an issue for Congress to remedy. It's just a possible statutory amendment. Right. That's what the issue is. It said that in the event of multiple recoveries that would exceed the single award maximum, the Board should limit to the equivalent percentage of Section 6 max. Right. That's correct. So that Court interpreted it to be, to apply to one issue. The other thing, I'd like to just respond to a couple of Mr. Mess's arguments, positions. There was a stipulation that Mr. Price was entitled to temporary total disability, but the ALJ misstated the stipulation in the, in his opinion. The stipulation was not to, not that he was paid, but that he was entitled to it. He said the stipulation was to payment, and that wasn't true. And I discussed that on page 3 of the gray brief and have the cites to the record where it goes right to exactly what was stated before the administrative law judge. And this is an issue. We did raise it as the compensation rate was an issue. The other, just one brief minute, the administrative law judge did allow testimony as to the catwalk jobs. The wage record supported a loss. It did not support any increase. There was actually, Mr. Price had loss of hours in 97 and 98 compared with 1990, and there were less longshoremen in the port, and more work, more ships were coming in. So essentially, he should have had more work and not less work, and it did support a, an increase in his wage, in his wages. The testimony at the hearing was very clear that he did lose these 22 days. In the deposition, it was a little bit unclear, but the reactions of the, in the deposition from Mr. Metz and Mr. Dudry indicated that they understood that he was losing time from those jobs. Roberts. Thank you, counsel. We compliment all of you on your ability to penetrate the mysteries of this interesting  law. We'll do our best to get you a correct decision as soon as we can. Thank you. Case just argued is order submitted, and we are adjourned for the week.
judges: Trott, Fisher, Gould